FILED

IN THE IOWA DISTRICT COURT IN AND FOR SCOTT COUNTY 2014 FEB 19  PM 3:31

CLERK OF DISTRICT COURT
SCOTT COUNTY IOWA

| | | |
|---|---|---|
| ABIGAIL FREDERICKSEN, | ) | |
| | ) | |
| Plaintiff, | ) | LAW NO: *124716* |
| | ) | |
| vs. | ) | |
| | ) | PETITION AT LAW |
| JENNIFER OLSEN, in her individual | ) | and |
| capacity; JENNIFER OLSEN, | ) | JURY DEMAND |
| in her capacity as the Court | ) | |
| appointed Guardian and Custodian of | ) | |
| Plaintiff's Infant daughter, acting | ) | |
| under the color of State Law; and A.M. | ) | |
| and B.M., a married couple, | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW the Plaintiff, Abigail Fredericksen, by and through her attorney, M. Leanne Tyler & Associates, P.C., 4431 E. 56th Street, Davenport, Iowa 52807, telephone 563-355-4040, and Harold J. Cassidy, attorney applying to be admitted *pro hoc vice*, of The Cassidy Law Firm, 750 Broad Street, Suite 3, Shrewsbury, New Jersey 07702, telephone 732-747-3999, and for her cause of action against Defendants, A.M. and B.M., individually, for her legal malpractice claim against Defendant, Jennifer Olsen, individually, and for her claim brought pursuant to 42 U.S.C. §1983, against Jennifer Olsen, acting under the Color of State Law as the Court appointed guardian and custodian of E.F-P., the infant daughter of Plaintiff, respectfully states to the Court as follows:

### Jurisdiction and Venue

1.  All contracts and documents referred to herein were entered into and executed in the State of Iowa.

1



**EXHIBIT**

_A_

2.      All causes of action herein and rights and obligations arose in the State of Iowa, County of

Scott.

**The Parties**

3.      Plaintiff, Abigail Fredericksen, residing at 26826 210th Avenue, Eldridge, Iowa 52748, was

a twenty year old college student when she gave birth to a baby girl (hereafter E.F-P.), on February

15, 2012.  She retained the Defendant Jennifer Olsen, (hereafter "Olsen") to represent her legal

interests and made it known to Olsen that she wanted to continue her relationship with her child,

while entering into some form of arrangement with a couple who would be primary care givers for

her daughter.  At all times, Plaintiff made it clear to Defendants Olsen, A.M. and B.M., that she did

not want to be cut off from her child, and if the arrangement she sought could not be attained, that

she would raise her child herself in her parents' home.

4.      B.M. and A.M. are a married couple currently living in the state of Missouri, who initially

approached Abigail Fredericksen when she was pregnant and induced her into entering into what she

believed to be a parenting arrangement by promising that Abigail (hereafter "Abby") would always

be in the life of her child, have access to her child, and would always maintain her relationship with

her daughter.  Through the assistance of Jen Olsen, B.M. and A.M.  induced Abby to terminate her

parental rights, against the intentions of Plaintiff, cutting Abby completely out of the life of her child.

With the help of Defendant Olsen, A.M. and B.M. had Abby's rights terminated, adopted the

Plaintiff's daughter and has refused to permit the Plaintiff to have any parenting time with her

daughter.  A.M. and B.M. are identified by their initials in order to protect their privacy and that of

the child E.F-P.  Their full identity and address is disclosed under seal.

2

5.    Plaintiff challenges the constitutionality of Iowa Adoption Laws, I.C.A.: T. XV Subt. 1 ch. 600 *et seq.*, as they are applied to the termination of the fundamental constitutional rights and liberty interests of Plaintiff in her relationship with her infant daughter born on February 15, 2012.

6.    Jennifer Olsen is a licensed attorney in the state of Iowa who has her principal place of business at 2805 Eastern Avenue, Davenport, Iowa, who was initially consulted and retained by Plaintiff and the Fredericksen family to represent Plaintiff in creating a parenting plan to take the form of an "open adoption" plan and who, in conjunction with A.M. and B.M. breached her duty to Plaintiff and violated her legal, ethical and fiduciary duty to Abby Fredericksen resulting in the violation of Plaintiff's constitutional and parental rights. The father of Baby E.F-P., B.P., at all times, also believed, and was led to believe, that Defendant Olsen represented Plaintiff's interests as well as his own.

7.    Jennifer Olsen is also sued in her capacity as the Court appointed Guardian of Plaintiff's infant daughter, acting under Color of State Law. Defendant Olsen used her authority in that capacity to frustrate and violate the interests and constitutional rights of Plaintiff. Plaintiff challenges the constitutionality of Iowa Adoption Laws, I.C.A.: T. XV Subt. 1 ch. 600 *et seq.*, as they are applied to the termination of the fundamental constitutional rights and liberty interests of Plaintiff in her relationship with her infant daughter born on February 15, 2012.

**Statement of Facts**

8.    On July 7, 2011, Abigail Fredericksen ("Abby") obtained a positive pregnancy test and learned she would give birth when she was eighteen and a half years old.

9.    The father of her child was B.P., whom she had dated for a lengthy period of time.

10.     At the time that Abby and B.P. learned that Abby was pregnant they both had plans to attend college.

11.     Abby and her entire family were very active at their local church.  It was an important part of their lives which helped shape their belief system.

12.     The pregnancy was unplanned, and upon learning that she was pregnant, Abby initially felt overwhelmed by the responsibility.  She found the circumstance stressful.

13.     Plaintiff Abby Fredericksen's normal decision making capabilities were compromised by the stress of her circumstances.

14.     Abby disclosed the pregnancy to B.P. and her parents and they all tried to support her emotionally.  Abby continued to experience a great deal of anxiety and distress over the circumstance and the uncertainties it created in her life.  She started to assess all of her options.

15.     Abby's value system dictated that she would give birth, but she was uncertain about how she would raise her child while pursuing her other goals.

16.     Abby sought counseling at a local pregnancy help center, accompanied by her mother and father.  There, Abby met with a counselor.  It was in this initial counseling session that the counselor discussed the possibility of Abby putting her baby up for adoption.  Until that time, Abby had not considered adoption.  The counselor at the pregnancy help center provided Abby and her mother with a list of local lawyers experienced in adoption with whom she could consult.  On this list was a local attorney named Jennifer Olsen.

17.     Abby and the Fredericksens knew virtually nothing about adoption.  By the end of her first meeting with Defendant Olsen, Abby made it known that she did not wish to be permanently cut off from her baby.  She began to discuss how her intended goal of keeping her relationship with her

4

baby would fit in the context of an adoption. In the first meeting with Olsen, B.P. introduced the concept of an "open adoption."

18.     After discussing an "open adoption" with B.P., Abby began researching what was written about "open adoption." Abby began to think that what she understood as an "open adoption" was a mechanism for her to achieve her goal of keeping her relationship with her child and her rights, while at the same time the baby would have the benefit of other care givers. She would not accept an arrangement which would have cut off her relationship with her baby.

19.     Shortly after Abby concluded that she would explore an "open adoption", she spoke with a woman who was a member at her church. This woman, A.P., reinforced Abby's decision to give birth, gave her encouragement and told her she was doing the right thing. A.P. was the mother of Defendant A.M. who ultimately adopted Plaintiff's child with the aid of Abby's attorney, Defendant Olsen.

20.     Beginning on September 13, 2011, A.P. kept in touch with Abby and she texted her on a number of occasions. On September 14, 2011, A.P.'s daughter contacted Abby via Facebook to introduce herself. On September 21, 2011, A.P.'s other daughter, Defendant A.M. contacted Abby directly, for the first time. That is when Abby learned for the first time that A.M. and her husband B.M. wanted to adopt, and the family was in touch with Abby because A.M. and B.M. wanted to adopt Abby's daughter.

21.     At all relevant times, A.P. and her family all knew that Abby wished to remain in the life of her child and was only considering what she understood to be an "open adoption" for this reason.

22.     Through various conversations with different family members and friends, Abby decided that she preferred to work with a family that did not already have a child.

23.    A.P. called Plaintiff's mother, Jennifer Fredericksen, and told her that her daughter A.M. would like to speak with Abby about adopting E.F-P. Jennifer told A.P. that A.M. and B.M. did not fit Abby's idea of an adoptive family because she and her husband already had two children. Jennifer thought this was a polite way to tell A.P. that her daughter and son-in-law should not contact Abby. Despite Jennifer's caution, A.P. continued to push the idea of A.M. adopting Plaintiff's child.

24.    A.M. sought out and emailed Abby through Facebook. She became aggressive in trying to induce Abby into letting A.M. and her husband B.M. get involved in raising Plaintiff's daughter. Thereafter, A.M. continued a campaign to persuade Abby to let A.M. and B.M. raise Plaintiff's daughter and made repeated promises to Abby that Plaintiff would be allowed to maintain her relationship with her child. These promises were made to induce Abby's reliance upon them, when in fact, A.M. and B.M. did not intend to permit such a relationship if and when they secured a judgment of adoption in Iowa. A.P. also made repeated assurances to both Jennifer and Abby that Abby would be able to continue her relationship with her child.

25.    In September of 2011, when Plaintiff was in her fifth month of pregnancy, Plaintiff Abby Fredericksen, her mother and father, as well as B.P. and his parents, went to the law office of Defendant Jennifer Olsen, for the purpose of securing the assistance of an attorney to advise them about the legal process of adoption, to represent Abby throughout the negotiation process with prospective adoptive parents and to represent Plaintiff's interests throughout proceedings in Court. Both Abby and B.P. wanted and expected Olsen to provide them with legal representation which protected their rights. Beginning at the end of this meeting with Defendant Olsen, both Plaintiff and B.P. made it clear to Olsen that they did not want a complete termination of their parental rights, and that if there was an "adoption," it had to be an "open adoption."

6

26.    Subsequently, Olsen admitted in writing that Plaintiff Abby Fredericksen always wanted a "parenting plan" all along.  Olsen knew that the Fredericksens sought her out to represent Abby's interests and to take all necessary measures to protect Abby's relationship with her child.

27.    Olsen also knew that Plaintiff, Abby Fredericksen, did not want to have a traditional adoption which resulted in the complete termination of Plaintiff's constitutionally protected relationship with her child and all of her parental rights.  Despite that knowledge, Defendant Olsen proceeded with an adoption as hereafter described.  Olsen knew that Plaintiff, Abby Fredericksen, was under stress and that her decision making ability was fragile, and she was in special need of guidance and direction.  Olsen knew, or should have known, that she should not move forward with an adoption because the arrangement Plaintiff sought was not legally obtainable under Iowa Law.

28.    In her campaign to induce the Plaintiff into surrendering her child for adoption, A.M. sent emails intended to make Abby feel special and make her feel like she had a special bond with A.M.  This effort of Defendant A.M. was designed to engender trust which induced Abby to think of A.M. both as a potential parent figure for her daughter and also as a family member and friend who she could trust and on whom she could rely to help preserve Abby's relationship with her daughter.

29.    Throughout the next couple of months A.M. continued to contact Abby and her family.  She would often ask about how B.P. was doing and how he felt about her and her husband.  A.M. was concerned about B.P. because he did not seem to be accepting of A.M. and B.M. as a prospective couple with whom they could co-parent.

30.    Abby was introduced to a member of her church congregation whose daughter successfully implemented an "open adoption" with her own child.  The circumstances of the "open adoption" were disclosed in detail and the relationship between that birth mother and her daughter was very

7

strong years after the adoption took place. This led Plaintiff to believe that the arrangement described by A.M. was common and successful.

31.     Abby was relieved and delighted to learn about successful "open adoptions." She had a deep sense of obligation toward her unborn child. She began to believe an "open adoption" was a good option for her because A.M. made her believe her relationship with her child would not be terminated.

32.     Abby openly conveyed the fact that she desired to continue her relationship with her child and continued to express the fact that she needed to be in her child's life for the sake of her child and herself. She expressed this on numerous occasions to A.M. and B.M. as well as Defendant Jennifer Olsen.

33.     Sometime in early November, 2011, Abby and B.P., along with their parents, had a meeting with B.M. and A.M. At this meeting B.M. described in significant detail what the open relationship would mean and how it would work for everyone's benefit. He stated "that there are not enough people to love this child" and told Abby and B.P. that they would always be in their child's life. He said that they would be extended family and that it is in the child's best interest that they all have contact and love her. Both A.M. and B.M knew that Plaintiff would rely upon their representations and promises and the statements were made precisely to induce reliance upon them and to induce Plaintiff to surrender her child to them for an adoption. At all times, unbeknownst to the Plaintiff, the Defendants A.M. and B.M. felt they could and would cut off Plaintiff from her child whenever they wanted, once they had induced Plaintiff to let them adopt her child under Iowa Law.

34.     After this meeting, B.P. was still not sure if A.M. and B.M. were the right people with whom they should parent. However, because of their promises he did warm up to the idea of an "open

8

adoption" for their child and he and Abby ultimately felt that B.M. had made a firm promise that they would always be in their child's life. He convinced them that they could rely upon the A.M. and B.M. to keep their word. Abby made it clear that her determination to stay in her daughter's life was an absolute condition for her to let anyone else parent her child. That condition was non-negotiable. She believed the representations of A.M. and B.M. that Abby and B.P. would keep their relationship with their child.

35.     As a result of the promises and representations of the Defendants, A.M. and B.M., Abby told B.P. that she did not want to interview other parents. She only desired an "open adoption" and was only willing to consider potential parents that would allow her to remain in the life of her child. A.M. and B.M. knew this and told Abby how the adoption process would be a happy one – Abby would be overjoyed because the arrangement was "almost too good to be true." A.M. and B.M. continued to promise that Abby's relationship with her child would continue. For her part, Abby made it known that she would not give up her child for a traditional adoption and that she would raise the child herself, with the help of her parents and B.P., if her only option was for her relationship with her child to be terminated.

36.     During their visit to Iowa, A.M. and B.M. went out to dinner with Abby and B.P.. Although A.M. and B.M. were older than Plaintiff they were close enough in age that Abby felt a strong bond like they were friends or siblings. This bonding made Abby feel like they were close and that they would never lie or betray her.

37.     In early December, 2011, Abby and B.P. told A.M. and B.M. that they would like them to parent their child and that they were happy that they understood the situation and that having an "open adoption" was the only way they could let someone else help parent their child. Once A.M.

9

and B.M. won the trust of Abby and B.P. they continued to repeat their promises and assurances that Abby would have a relationship with her child.

38.     In December 2011, A.M. and B.M. were still in their mid-twenties. Abby felt that this was very important because A.M.'s and B.M.'s young age made her feel more comfortable around them. She felt the age would allow them to build a good relationship and would allow her relationship with her child to be easier. She openly expressed this fact to A.M. who reinforced this belief by statements of agreement with Abby's feelings. Abby made it clear that a good strong relationship with A.M. and B.M. was an essential element of the parenting arrangement.

39.     Abby made it known to A.M. and B.M. that she felt a strong bond with her baby. Although Abby wanted a couple who was childless, she felt reassurance in the knowledge that A.M. had carried and given birth to two of her own children. Abby believed that A.M. would empathize with Abby's situation because A.M. experienced the mother-child relationship. Abby believed that because A.M. understood Abby's feelings as a mother, A.M. could be trusted to protect Abby's interests and those of her child. A.M. said things to make Abby believe that she would not be too possessive and would honor her commitment. A.M. repeatedly told to Plaintiff that the open arrangement would be good for Plaintiff's daughter.

40.     Abby always knew that whomever she chose to parent her child would be a very important part of her life and that she would need to be able to relate and communicate with them since she would always be in the life of her child. Because of this, in November 2011 she had her physician keep the sex of her baby confidential with the test results in a sealed envelope, until Abby sent the envelope to A.M and B.M. Abby had a strong relationship with her parents and the Fredericksens had a strong family life, in which the children had a great relationship with their parents. They had

a beautiful home and the living conditions would have provided a great home for E.F-P. The family was well off financially and was quite capable of giving her child an excellent home. Had Abby known that she would be cut out of the life of her child, she would have raised her child herself in her family's home.

41.     But now comfortable with her personal relationship with A.M. and B.M. and believing them that Abby and B.P. would always have a strong relationship with their child, Abby and B.P. mailed the sealed envelope containing the results of the sex testing for Plaintiff's unborn child to the A.M. and B.M. so that A.M. and B.M. could decide if they wanted to know the sex of Abby's baby at the same time they found out that they had been selected to help parent her. Abby was excited that she met what she thought were the perfect parents for the arrangement she sought and was ready to work with A.M. and B.M. in an "open adoption" arrangement. She felt that sending the information about the baby's gender would help foster the relationship between Plaintiff and A.M. and B.M. Her view was that they were all in it together as co-parents. Abby didn't plan to open the envelope until Christmas. A.M. and B.M. had opened the envelope and found out the baby was a girl. To further engender a sense that Abby would always be included in the life of her child, A.M. and B.M. sent her and B.P. girl's baby clothes at Christmas.

42.     By December, 2011, A.M. and B.M. were planning to move from their home in Texas to Missouri. Despite the fact that they stated that they wanted to parent Abby's daughter and keep the relationship between Abby and her daughter strong, they refused to pay Abby's medical bills which was one promise they had made to Abby during their many discussions. However, A.M. and B.M. promised that they would pay Abby back in the future for the medical expenses she paid.

11

43.     A.M. wanted to come and stay in the Davenport, Iowa area prior to Abby's due date. A.M. frequently called Jennifer Fredericksen to inquire when the baby was due. Because Abby and Jennifer were led to believe they would all be family, the Fredericksens arranged for them to stay at Abby's grandparent's house for a number of weeks. A.M. and B.M. arrived on or about February 7, 2012.

44.     During this time the Fredericksens would visit A.M. and B.M. like they were family. They would bring them food and help them out anyway they could. At all times A.M. and B.M. were friendly and acted as though they were family and excited to share raising E.F-P. with the Fredericksens. Subsequent events exposed the fact that A.M.'s and B.M.'s stay at the Fredericksens was a further effort to engender the trust of Abby in order to induce her to surrender custody of her daughter to them, and in order for A.M. and B.M. to be in Davenport to insure that Abby did not change her mind.

45.     In Mid February, 2012, B.M. was compelled to leave Iowa for business. A.M. had her heart set on staying in Iowa until the baby was born. On February 8, 2012 Abby visited her treating physician and was told that it would be a little while longer before the baby was born. On February 13, 2012, Abby had another appointment with her Ob/gyn. On this occasion, A.M. accompanied her to her doctor's office and was present for her examination. Worried that B.M. had to leave, A.M. requested that Abby have her labor induced to accommodate the schedule of B.M. Abby's physician refused to do so because Abby was not dilated. A.M. became noticeably irritated by that refusal. Her irritation was noted by all present. At the time, Abby attributed her irrational behavior to the possible stress from the circumstances.

12

46.    During this time A.P. had been contacting Jennifer Fredericksen on a fairly constant basis. She would express how happy she was that the two families would be related through the mutual raising of the baby and that they would be sharing her going forward. A.P. constantly reinforced the belief that Abby would maintain her relationship with her child. A.P. made these assurances to both Plaintiff and Plaintiff's mother.

47.    On February 14, 2012, Abby went into labor. Between her doctor's appointment on February 8th and the start of her labor on February 14th A.M. and Abby spent a lot of time together. During this time Abby thought she was bonding with A.M. and building a foundation for a future relationship with her. Abby always expressed the need to be in the life of her daughter, and talked openly about the parenting arrangement.

48.    On February 14, 2012 Abby and B.P. met with their attorney Jennifer Olsen. She met with them to discuss how the procedure at the hospital would be conducted. A.M. and B.M. also attended that meeting. At this meeting Jennifer Olsen created something called "A Delivery Plan." Again, at this meeting, Abby reiterated how she expected to maintain her relationship with her child.

49.    On February 15, 2012 at 6:00 AM E.F-P. was born.

50.    For the first two hours following the birth of their child, Abby and B.P. spent time alone with their baby. Abby held, kissed and hugged her daughter, believing it the continuation of a life long relationship. After a couple of hours, Abby let B.M. and A.M. into the room and they all spent time together.

51.    Abby then took a nap and woke up at 11 AM that same day. She went to a different room where she held the baby and her relatives and B.P.'s relatives all came to visit. A.M. and B.M. entered the room with their two children. B.M. immediately became irritated and stated to Jennifer

13

Fredericksen, "this child does not even feel like it is mine." Jennifer had to exit the room because she became emotional over B.M.'s misguided sense of entitlement to the baby on the day she was born. Jennifer decided that B.M. was caught up in all of the chaos of the moment and was acting out of character.

52.    On February 16 and 17, 2012 Abby did not want any visitors at the hospital.  She preferred to have some time alone with her baby girl and required some rest from all of the stress that the situation was causing.  She did not want A.M. and B.M. to visit on those days.  A.M. and B.M. told Abby that they understood her feelings and situation.  However, A.M. and B.M. made numerous negative comments to others, including Jennifer Fredericksen, that led Jennifer to believe that they were upset with the situation.  Jennifer felt they acted as if they felt that Abby was not the mother of her child, but that they were the baby's parents.  Mrs. Fredericksen, at the time, dismissed the conduct as a product of their being away from home so long, and the fact that the entire experience was tiring.

53.    On Friday February 18, 2012, Abby and her baby were discharged from the hospital.  On the day of the discharge Abby held a prayer session in her hospital room and then walked down to the hospital parking lot.  When she reached the parking lot, A.M. was waiting to take Plaintiff's baby prior to any parental release forms being signed.  A.M. took the baby.

54.    Abby and B.P. were originally scheduled to meet with their attorney, Jen Olsen, on February 18th.  They were told they had to sign certain forms.  Abby and B.P. decided that they would wait until Monday, February 20th to meet with Jen Olsen.  When A.M. and B.M. learned that the meeting was delayed, they expressed anger over Abby waiting until the 20th to meet with Olsen.

14

55.   On Monday February 20, 2012, Abby and B.P. went to Jen Olson's office.  At this time Jennifer Olsen knew that Abby did not want her relationship with her child terminated.  Olsen knew that Abby only wanted an open parenting arrangement and that she did not want her parental rights terminated.  Even though she knew that Iowa did not recognize "open adoptions" and that a traditional adoption would terminate Abby's parental rights against her wishes, Olsen had Abby sign a form to release custody of her child to Jen Olsen.  By drafting a document that gave her exclusive custody of Plaintiff's child, Olsen put herself in a further conflict of interest with her clients' interests and rights.  The signing of that document started the process which ultimately completely terminated Abby's rights.  Even though the form was briefly discussed with Abby she believed that this was merely a formality and that both Jen Olsen and A.M. and B.M. knew that she never wanted to terminate her rights.  Abby believed her relationship with her daughter would continue.

56.   On February 20, 2012, both Abby Fredericksen and B.P. believed that Jennifer Olsen was their attorney protecting their interests.  They did not understand the adoption law under Iowa Law.  They were entirely dependant on Defendant Olsen to explain the laws to them, and to act in their interests to protect their constitutionally protected interest in their relationship with their daughter, E.F-P.

57.   Under Iowa Law, the release of custody document gave Defendant Olsen the authority to petition the Court to have Olsen appointed as guardian of E.F-P., and as such, she possessed, under the power of the law, and under the color of state law, the authority to place the child in the custody of whomever she determined to take custody.  As of November 20, Olsen had an irreparable conflict of interest.  She took on the legal representation of Plaintiff, while she acted to advance the interests

15

of Defendants A.M. and B.M. She made a financial arrangement with A.M. and B.M. to be paid by them.

58.     Defendant Olsen knew that there was no legal way under Iowa Law to enforce the kind of parenting arrangement sought by the Plaintiff, that an "open" adoption was not enforceable under the law. She went ahead, while in conflict, to accept the "Release of Custody" from the Plaintiff on February 20, 2012.

59.     The Release of Custody document that Olsen prepared and had Abby Fredericksen sign, gave Olsen the authority to file a petition for termination of parental rights knowing that such a termination was contrary to the intentions of Plaintiff.

60.     Plaintiff was induced into believing that Olsen would protect her interests at a time when Olsen was advancing the interests of A.M. and B.M. which were in direct conflict with the interests of Plaintiff.

61.     Neither Plaintiff, Abby Fredericksen, nor B.P. was provided with any independent counseling of any kind. They did not have an independent lawyer who only represented their interests and they received no physiological counseling despite the fact that Plaintiff was under great stress when faced with the most important and most emotional decision of her life. Olsen knew that Plaintiff did not want her rights terminated and proceeded without providing any psychological counseling or independent legal counsel.

62.     Iowa Law does not require mandatory independent counseling, which is a clear deficiency in its statutory scheme, which creates the mechanism to terminate a mother's constitutionally protected interest in her relationship with her child. Under the circumstances in which Plaintiff's

16

rights were terminated, her decision to surrender her rights was uninformed and under the facts as set forth below, involuntary.

63.     The "Release of Custody" was drafted by Defendant Olsen. It's terms were dictated by Olsen and Plaintiff had no say in its language or terms. Plaintiff was not offered independent legal counsel to review the document, or to assist in drafting its terms. The document did not reflect the intention of Plaintiff and constituted a contract of adhesion proposed by Olsen for the exclusive benefit of A.M. and B.M. and her own benefit. While the "Release of Custody" recited what Defendant Olsen says Plaintiff was "advised," Plaintiff was assured by both Olsen, as well as A.M. and B.M. that Plaintiff would remain in the life of her child and her constitutionally protected relationship with her child would continue. The repeated assurances of A.M. and B.M. and Olsen's work to promote their interests all operated to frustrate Plaintiff's interests, and were all designed and intended to interfere with Plaintiff's relationship with her child by acting to permanently terminate her relationship against her will.

64.     Because Plaintiff sought to continue to build and maintain a strong relationship with A.M. and B.M. for the sake of advancing the interests of her baby daughter, Plaintiff acted out of trust for A.M. and B.M. as well as trust for Olsen and in reliance of Olsen acting in Plaintiff's best interests by advancing her interests. While the "release" recited that Plaintiff could "revoke" the release within four days, the relationship built between A.M., B.M. and Olsen made that "unnecessary" and counterproductive because such a revocation would have undermined the relationship of the parties. Olsen (and A.M. and B.M.) knew that once Plaintiff signed the "Release of Custody" Plaintiff would not upset the relationship by "revoking" the release.

17

65.     Between February 18, and February 20, 2012, A.M. and B.M. had physical custody of E.F-P. Abby tried constantly to get in touch with A.M. so she could visit the baby, but A.M. did not respond. Abby drove to her grandparents house where A.M. was still staying, and A.M. would only permit Abby to see her daughter for 20 minutes. This behavior even alarmed A.P., A.M.'s mother, enough that A.P. volunteered to speak with A.M. about her behavior.

66.     A.M.'s behavior was now worrying Abby and she was having doubts about the arrangement. Abby had told everyone including B.M., A.M., and Jen Olsen that she only desired an "open adoption" and needed to be in her child's life for both of their benefit.  She repeated her intentions. Despite knowing that Abby didn't want her parental rights terminated and that Iowa did not recognize "open adoptions," Jen Olsen again consoled Abby and told her that "open adoption" agreements are not signed, but are successful. Abby's father set a meeting with A.M. and B.M. for February 22nd.

67.     On the night of February 22nd, two days before the surrender of rights became irrevocable, Abby drafted a document she called "Expectations For The Future" which laid out her understanding of how the arrangement between her and A.M. and B.M. would work for the benefit of her daughter. This was Abby's way of telling all parties involved, including Jennifer Olsen, that if this arrangement was not possible than the adoption process needed to be stopped. To Abby, it was a contract that set out the terms of the parenting arrangement.  Abby gave a copy of this document to all parties including Jen Olsen.

68.     On the night of the 22nd everyone met at Abby's grandparents' house. B.M. was away on business so he joined the conversation via Skype. The parties discussed the document "Expectations For The Future." All parties agreed that they would abide by the terms of the agreement. B.M. again

18

reiterated their intentions, defined an "open adoption," and talked about Abby always being in the life of her child. He stated they would send pictures, they would Skype, she would visit, and that they wanted her to do all of these things. B.M. gave these assurances in order to get past the February 24, 2012 date, which was the last day under Iowa Law, that Abby could revoke her consent.

69.     Defendant Olsen knew that on February 22nd, Abby did not want an adoption under Iowa Law and that she expected that the written contract would be completely honored. Olsen knew that if the Release of Custody was not revoked by February 24th, that the decision was irrevocable unless there was a court filing that met a very difficult standard. Olsen failed to file a revocation on behalf of her client, Abby Fredericksen, in order to preserve Abby's rights. Instead, she took steps to cut off her client's rights, against Plaintiff's wishes, and took steps to advance the interests of A.M. and B.M.

70.     On Friday, February 24, 2012 the last day on which the "Release of Custody" could be revoked, Abby requested that she be allowed to spend the day with her daughter. A.M. didn't want to let Abby see her daughter on this day, a fact she later revealed. However, A.M. did so to insure that a revocation of the release was not filed.

71.     A.M. and B.M. left Iowa on the morning of March 3, 2012. Between February 24 and March 3, 2012, Abby was allowed to visit with her daughter several times. Abby's last visit in Davenport was scheduled for March 2nd. A.M. and B.M. drove to Abby's grandparent's house to say goodbye. The morning of March 3rd Abby asked to see her daughter again before she went to Texas with them. A.M. and B.M. were upset about this visit.

72.     In the late morning of March 3, 2012, A.M. and B.M. left Iowa. They left irritated with Abby Fredericksen's visits with her daughter. When they left Iowa, they had achieved the goal of convincing Abby Fredericksen to surrender her parental rights to her daughter and had Defendant

19

Olsen place custody of the child with A.M. and B.M. They achieved this goal by telling Abby that in accordance with her wishes the adoption would be open expressing numerous times that Abby would always be in the life of her daughter, an obligation that A.M. and B.M. violated almost immediately after they successfully separated mother from daughter through intentionally misleading representations and promises which were relied upon by Abby.

73.    On the day A.M. and B.M. left Iowa, on March 3, 2012, they renewed their assurances to Plaintiff that she would remain in the life of her child. On that day, Plaintiff was the mother of E.F-P. in fact, and in law. Abby felt confident that A.M. and B.M. would keep their promise to her and that her relationship with her daughter would continue in a healthy manner.

74.    On March 6, 2012, a hearing was held in the Juvenile Court in Scott County, in which Defendant Jen Olsen appeared in her capacity as guardian and custodian of E.F-P., and led the Court to believe that Plaintiff wanted her parental rights and relationship with her child terminated when, in fact, Defendant Olsen knew that Plaintiff did not want her rights and relationship terminated.

75.    Defendant Olsen select an attorney, Dana Copell, to act as the *Guardian ad Litem* of E.F-P., and Copell was appointed *Guardian ad Litem* by the Court on February 24, 2012. Neither Olsen nor Capell did home visits or investigation of the living arrangements of A.M. and B.M. Capell never did a home visit of the Fredericksens. In fact, Copell, as *Guardian ad Litem*, never contacted Plaintiff Abby Fredericksen, or her parents, and never contacted B.P. and his parents. Despite this lack of information, Capell filed papers with the Court asking that Plaintiff's parental rights and her relationship with her child be completely terminated, and claimed, incorrectly, that such termination was in the best interests of the child. Capell had no way of knowing whether Capell's statements,

20

made to the Court were true or not. Both Defendant Olsen and Capell argued for the termination of Plaintiff's relationship with her child.

76.     Defendant Olsen, while appearing in Court on March 6, 2012, knew that entry of an Order terminating Plaintiff's rights was completely contrary to the arrangement sought by Plaintiff, yet she misled the Court into thinking Plaintiff wanted her rights terminated.

77.     In complete reliance upon the representations of Defendant Olsen, as well as the arguments of Capell, on March 6, 2012, the Court entered an Order terminating the parental rights of Plaintiff and terminating all relationships she had with her infant daughter.

78.     Under Iowa Law, the custody of the infant E.F-P. remained with Defendant Jennifer Olsen until such time that Olsen permitted another person to adopt the child. Olsen allowed Defendants A.M. and B.M. to keep custody of the child.

79.     After A.M. and B.M. had physical custody of Abby's infant daughter, they paid Jennifer Olsen's attorney's fees. Accepting these payments, under the circumstances of her representation of Plaintiff, was in direct conflict with Olsen's fiduciary and legal duties to both Abby and her daughter's best interests.

80.     Within two weeks of leaving Iowa, A.M. and B.M. started to cut off communication with Abby. Without any prior notice or discussion they cut off Abby and B.P.'s access to A.M. and B.M.'s Facebook page contrary to their promises. This was particularly distressing to Abby because Facebook was a way for her to see pictures of her daughter and share in her daily life. This was the first clear effort by A.M. and B.M. to start the process of intentionally cutting Plaintiff off from all contact with her daughter. This happened shortly after the March 6, 2012, Order legally terminating Plaintiff's rights.

81.    After finding out that she lost access to the A.M.'s Facebook page, and pictures of her daughter, Plaintiff contacted A.M. and B.M. They expressed dissatisfaction with her objection to being cut off from their Facebook page. A.M drafted an email explaining that she had to cut off Abby and B.P.'s access because she could not look at pictures of them and feel like Abby's daughter was her child. Despite the fact that Abby had repeatedly stated that she would only go through with an "open adoption" and that the couple had to be morally and emotionally prepared and willing to handle such an arrangement, A.M and B.M. never expressed any doubts about being able to handle that arrangement and reassured Abby that she would always be in the life of her daughter. Once the March 6, 2012 Order was entered, all of that changed and for the first time A.M. told Abby how she had difficulty with the arrangement.

82.    A few more weeks passed and Abby and B.P. never regained access to A.M.'s Facebook page. Jen Olsen, the legal guardian of Abby's daughter, contacted A.M. to discuss the issue. She told A.M that if she was having issues with bonding with the child she should seek counseling. She also stated that Abby and B.P. needed access to her Facebook page. The agreement was for an "open adoption" and Facebook was an important aspect of the arrangement. A.M. and B.M. insisted the adoption was still open, but never gave back access to their Facebook page.

83.    Near the end of March, 2012, Abby texted A.M. She wanted to know if she could have a Skype conversation with her. A.M insisted on only talking on the phone and then made mean spirited remarks that Abby was disrespectful. Abby, feeling helpless, and realizing that A.M. and B.M. had never intended to let her be in the life of her child, started to cry uncontrollably that night.

22

84.     That night Jennifer Fredericksen decided to call A.M. She told A.M. that Abby was fearful that A.M. and B.M. were cutting Abby out of her daughter's life and told her why they could not do that. A.M replied, "I can do anything I want."

85.     The whole Fredericksen family now became deeply concerned. Abby became depressed over being misled, ultimately leading her to seek psychiatric care. The Fredericksens began to realize that they had intentionally been misled by A.M. and B.M. about their intentions. Now that they had convinced Abby to terminate her parental rights they were cutting Abby completely off from her daughter.

86.     About a month later at the end of April, 2012. A.M. called Abby to complain that she was not bonding with Abby's daughter. She stated that the whole process was not how they planned and Abby should take her baby back. Abby immediately agreed to take her daughter back and to raise her.

87.     Shocked that Abby wanted her daughter back, A.M called up B.P. and lied to him. She told him that Abby had contacted her very distraught and was begging for the baby back. A.M. created tension between Abby and B.P..

88.     The next night A.P. contacted Jennifer Fredericksen to say that Abby was being disrespectful to A.M. and that she lacked discipline. She told Jennifer that Abby needed to take the baby back and wanted to fly the child back to Iowa from Texas.

89.     Abby was overjoyed at the prospect of getting her daughter back and she told A.P. that she wanted her baby back. The Fredericksens said it needed to be done correctly and that they needed to get Jen Olsen to advise on the legal issues involved in having the child returned.

90.     The Fredericksens contacted Jen Olsen to discuss arranging to obtain the release of the child

and for Abby to have her legal rights reinstated.

91.     Abby also contacted B.P. to discuss the situation.  B.P. was confused.

92.     The Fredericksens met with B.P. and his parents.  They told them that it was a blessing that

they had an opportunity to get E.F-P. back.  They assured B.P. and his family that B.P. would not

be expected to take responsibility at all for the child.

93.     The next day Jennifer Olsen contacted the Fredericksens and told Abby that it was impossible

for Abby to take physical custody of her baby without B.P.'s consent. B.P. stated that he did not want

the child returned and was against Abby raising her.  Olsen told Abby and Jennifer that under the law

she could not place her child with Abby without the consent of B.P..  This statement was false and

Olsen knew it was false.  Olsen made this statement with the intent for all of the parties to rely upon

it.

94.     After being told that she needed B.P.'s permission, the Plaintiff believed what Olsen told her

was true.  She believed that there was no way she could receive her child back without the agreement

of B.P..  The Fredericksens again visited B.P. and his family.  They begged them to agree to allow

Abby to take custody of her daughter.  B.P. and his family declined.  B.P. did not want the primary

responsibility of raising the child and thought that he would have significant legal responsibility if

the child was returned to Plaintiff.

95.     Under Iowa Law, Defendant Olsen had the authority to place Plaintiff's daughter in the

custody of Plaintiff.  Olsen could have obtained the return of the child.  A.M. and B.M. had no legal

authority to keep the child against the wishes of Olsen.  Olsen had a duty to her client, Abby

24

Fredericksen, to act in her interests, and to see that the child was returned to her. Olsen breached her duty to Plaintiff by continuing to keep Plaintiff's child from Plaintiff.

96.     A short time later Jennifer Olsen called Plaintiff and repeated the false statement that B.P.'s permission was required.

97.     Soon thereafter, the Fredericksens met with Jennifer Olsen at her office. The purpose of the meeting was to talk about the situation now that Olsen had told everybody that Abby cannot legally take back custody of her daughter who was then little more than two months old.

98.     In order to appease Abby and advance their interests, B.M. and A.M. agreed to open up their Facebook to her, in a limited manner. This meant that Abby and B.P. could see pictures of their daughter without being "friends" or having full access to the A.M.'s account. It also meant that A.M. could pick and choose which photos of Plaintiff's daughter she would allow her to have access.

99.     On May 11, 2012, A.M was in Michigan with her two sons. She had left E.F-P. in Texas with her mother, A.P.  A.M. was still struggling with the baby because she felt she was not "bonding" with Plaintiff's daughter.

100.    On May 13th A.P. flew back to Iowa for a family emergency. She brought Plaintiff's daughter with her. She left E.F-P. with Abby overnight on May 13th and picked her back up at noon on May 14, 2012. This was the last time Abby saw her daughter, except for one time in late 2013.

101.    On July 12, 2012, Jennifer Olsen again stated that she could do nothing to help Abby get her daughter back. Olsen knew that this statement was false. Abby, still believing Jen Olsen represented her interests, and relying on her legal advice, believed this statement to be true. Olsen said that the adoption was 100% complete and there was nothing that could be done to reverse it. This statement was false, and Olsen knew it was false. This statement was made before the adoption was finalized

25

and Olsen could have placed the child with Plaintiff. If Plaintiff had known that the statement was false, she could have and would have retained new counsel and moved the Court to vacate the termination of Plaintiff's rights. Jen Olsen made an intentional misrepresentation to Abby.

102.    A.M. and B.M. broke all of their promises made to Plaintiff and B.P..

103.    Thereafter, Abby, heartbroken, and looking for any help to stay in the life of her daughter, wrote a letter to A.M. She pleaded with A.M to return the child to her.

104.    After receiving this letter, A.M's father called Abby's father to state that the adoption was now officially closed. This came as no surprise to the Fredericksens. It was clear that the adoption had been closed almost immediately after A.M. and B.M. took the child to Texas. This was their last contact with anyone from A.M.'s family until Christmas 2012.

105.    Abby mailed a gift to her daughter for Christmas to A.M.'s family. When the gift arrived, A.M's father called the Fredericksens very upset stating the adoption was closed and that the gift would be mailed back. Abby was heartbroken.

106.    As a result of being permanently separated from her daughter, Plaintiff has suffered severe emotional distress and depression which has required treatment by a psychiatrist and psychologist, which continues to this time.

107.    A mother's unique relationship with her child during pregnancy is the most intimate, most important, and one most worthy of protection. That relationship is so intimate that the unique bond between mother and child creates a human relationship which may be the most rewarding in all of human experience. It was the duty of Defendant Olsen to protect Plaintiff's relationship with her child, which had a unique intrinsic value to Plaintiff, and Olsen violated that duty by acting in a way that would terminate Plaintiff's relationship with her child if termination was not clearly,

unequivocally desired by Plaintiff. The loss of that relationship was a profound loss which deprived Plaintiff of the benefits of her life long relationship with her child. It was foreseeable that if that relationship was completely terminated, that Plaintiff would not only suffer the loss of those benefits and her child's life long companionship, but that she was a great risk of psychiatric harm.

108.    Plaintiff's consents to release the custody of her child to Defendants and to the termination of her rights were uninformed and involuntary under the circumstances then and there existing.

## COUNT I

### Legal Malpractice vs. Jennifer Olsen, Individually

109.    The allegations of Paragraphs 1 through 105 are incorporated by reference as if set forth a length herein.

110.    At all times relevant hereto, Defendant Olsen was licensed to practice law in the State of Iowa, and as such, under the facts of this case, she owed a duty to Plaintiff, Abigail Fredericksen, to represent her interests. Her duties included, but were not limited to, her duty to protect the fundamental right of Plaintiff to her relationship with her child, E.F-P.; to properly inform Plaintiff of her rights and all legal matters relating thereto; to insure that any decision Plaintiff made with respect to her child was fully informed and fully voluntary; to insure that no Release of Custody, a petition for adoption, which would completely terminate Plaintiff's rights, were filed with a court because the termination was contrary to Plaintiff's desires and intentions; to fully inform and disclose to the Court that Plaintiff did not, in fact, desire, or consent to a voluntary termination of her rights, but instead, Plaintiff wanted to maintain her relationship with her child; a duty to stay free of any conflict between the interests Olsen and/or others and the interests of Plaintiff; to withdraw

27

as Plaintiff's attorney when a conflict of interest arose; to give completely accurate information to Plaintiff at all times during the course of the Court proceedings; to insure that the Court appointed *Guardian ad Litem* was fully informed about the intentions and desires of the Plaintiff, and to insure that the Plaintiff was aware that a *Guardian ad Litem* was selected and appointed; to insure that the Plaintiff was given an opportunity to confer with the *Guardian ad Litem* of Plaintiff's child prior to the termination of Plaintiff's rights; and numerous other duties, both subsumed by those enumerated here and others in addition thereto.

111.    The Defendant, Jennifer Olsen, breached her duties owed to Plaintiff and was in divers ways guilty of professional negligence, and legal malpractice.

112.    As a direct and proximate cause of the numerous breaches of duties of the Defendant, Jennifer Olsen, the Plaintiff's life-long relationship with her child, E.F-P.,has been terminated and the Plaintiff has lost the benefits of that relationship and has lost the life-long companionship with her child.

113.    As a direct and proximate cause of Defendant Olsen's breach of duties and professional negligence, the Plaintiff has been caused to suffer severe emotional distress, depression, mental harm and suffering and loss of enjoyment of life, all of which has been experienced by the Plaintiff since her loss of her relationship with her child and which will continue into the future.

114.    Because Jennifer Olsen's actions complained of herein were with wanton and willful disregard for Plaintiff's rights and interests, or with reckless disregard therefrom, punitive damages are appropriate.

115.    Plaintiff's damages far exceed the minimum statutory requirement for Iowa District Court Jurisdiction.

28

WHEREFORE the Plaintiff, Abigail Fredericksen, prays for judgment against the Defendant, Jennifer Olsen, in her individual capacity. As a direct and proximate cause of Defendant Olsen's actions complained of herein, Plaintiff has sustained the following damages:

a.    Compensatory money damages for the loss of the companionship with her child;

b.    Compensatory money damages for past emotional distress and mental injury;

c.    Compensatory money damages for future emotional distress and mental injury;

d.    Compensatory money damages for impairment of her pursuit of her normal activities;

e.    Compensatory money damages for impairment of her earning capacity;

f.    Punitive damages;

g.    Interest and costs of suit; and

h.    All other relief deemed just and equitable.

## COUNT II

### Defendant, Jennifer Olsen, in her Capacity Acting Under the Color of State Law as *Guardian Ad Litem* and Custodian of Plaintiff's Daughter

116.   The allegations of Paragraphs 1 through 111 are incorporated by reference as if set forth a length herein.

117.   In her capacity as Guardian and Custodian of Plaintiff's daughter, E.F-P., Defendant Jennifer Olsen acted under the color of state law within the meaning of 42 U.S.C. §1983. All of her negligent acts after her appointment on February 20, 2012 were performed under the color of state law.

118.   The acts of Defendant Olsen, while acting under the color of state law, constituted a violation of the Due Process liberty interests of Plaintiff guaranteed by the Fourteenth Amendment of the

United States Constitution as well as her fundamental right to her relationship with her child under the Constitution of the State of Iowa.

119.   The acts of Defendant Olsen while acting under the color of state law violated the Equal Protection rights of Plaintiff guaranteed by the Fourteenth Amendment of the United States Constitution, as well as her Equal Protection rights under the Constitution of the State of Iowa.

120.   As a direct and proximate cause of the numerous breaches of duties of the Defendant, Jennifer Olsen, in her capacity as guardian and custodian of E.F-P.,the Plaintiff's life-long relationship with her child, E.F-P.,has been terminated and the Plaintiff has lost the benefits of that relationship and has lost the life-long companionship with her child.

121.   As a direct and proximate cause of Defendant Olsen's actions in her capacity as guardian and custodian of E.F-P.,the Plaintiff has been caused to suffer severe emotional distress, depression, mental harm and suffering and loss of enjoyment of life, all of which has been experienced by the Plaintiff since her loss of her relationship with her child and which will continue into the future.

122.   Because Jennifer Olsen's actions complained of herein were with wanton and willful disregard for Plaintiff's rights and interests, or with reckless disregard therefrom, punitive damages are appropriate.

123.   Plaintiff's damages far exceed the minimum statutory requirement for Iowa District Court Jurisdiction.

WHEREFORE the Plaintiff, Abigail Fredericksen, prays for judgment against the Defendant, Jennifer Olsen, in her Capacity Acting Under the Color of State Law as *Guardian Ad Litem* and Custodian of Plaintiff's Daughter, for:

a.   Compensatory money damages for the loss of the companionship with her child;

b.   Compensatory money damages for past emotional distress and mental injury;

c.   Compensatory money damages for future emotional distress and mental injury;

d.   Compensatory money damages for impairment of her pursuit of her normal activities;

e.   Compensatory money damages for impairment of her earning capacity;

f.   Punitive damages;

g.   Interest and costs of suit; and

h.   An Order declaring that the termination of Plaintiff's constitutionally protected relationship with her child violated Plaintiff's rights guaranteed by the Fourteenth Amendment of the U.S. Constitution;

i.   An Order declaring the Iowa Adoption Law, I.C.A.: T.XV Subt. 1 ch 600 *et seq.*, is unconstitutional as it was applied to the termination of Plaintiff's constitutionally protected interest in her relationship with her child;

j.   An Order declaring that the Order terminating Plaintiff's parental rights and her relationship with her child be vacated;

k.   An Order directing that a hearing be scheduled to determine what visitation should be awarded to Plaintiff with her daughter E.F.P., consistent with the child's best interests; and

l.   All other relief deemed just and equitable.

## COUNT III

### Against A.M. and B.M. for tortious Interference with Plaintiff's Constitutionally Protected Parental Rights

124.   The allegations of Paragraphs 1 through 115 are incorporated by reference as if set forth a length herein.

125.   The acts of Defendants A.M. and B.M. constitute actionable tortious interference with the Constitutionally protected parental rights of Plaintiff.

31

126.    As a direct and proximate cause of the tortious acts of Defendants, A.M. and B.M. Plaintiff's life-long relationship with her child, E.F-P.,has been terminated and the Plaintiff has lost the benefits of that relationship and has lost the life-long companionship with her child.

127.    As a direct and proximate cause of Defendants A.M. and B.M.'s tortious acts, the Plaintiff has been caused to suffer severe emotional distress, depression, mental harm and suffering and loss of enjoyment of life, all of which has been experienced by the Plaintiff since her loss of her relationship with her child and which will continue into the future.

128.    Because Defendants A.M. and B.M.'s tortious acts, complained of herein were with wanton and willful disregard for Plaintiff's rights and interests, or with reckless disregard therefrom, punitive damages are appropriate.

129.    Plaintiff's damages far exceed the minimum statutory requirement for Iowa District Court Jurisdiction.

WHEREFORE the Plaintiff, Abigail Fredericksen, prays for judgment against the Defendants, A.M. and B.M., jointly and severally for tortious interference with Plaintiff's Constitutionally protected rights, for:

a.    Compensatory money damages for the loss of the companionship with her child;

b.    Compensatory money damages for past emotional distress and mental injury;

c.    Compensatory money damages for future emotional distress and mental injury;

d.    Compensatory money damages for impairment of her pursuit of her normal activities;

e.    Compensatory money damages for impairment of her earning capacity;

f.    Punitive damages;

g.    Interest and costs of suit; and

h.   An Order declaring that the termination of Plaintiff's constitutionally protected relationship with her child violated Plaintiff's rights guaranteed by the Fourteenth Amendment of the U.S. Constitution;

i.   An Order declaring the Iowa Adoption Law, I.C.A.: T.XV Subt. 1 ch 600 *et seq.*, is unconstitutional as it was applied to the termination of Plaintiff's constitutionally protected interest in her relationship with her child;

j.   An Order declaring that the Order terminating Plaintiff's parental rights and her relationship with her child be vacated;

k.   An Order directing that a hearing be scheduled to determine what visitation should be awarded to Plaintiff with her daughter E.F-P., consistent with the child's best interests; and

l.   All other relief deemed just and equitable.

## COUNT IV

### Against A.M. and B.M. for Deceit, Misrepresentations and Fraud

130.   The allegations of Paragraphs 1 through 117 are incorporated by reference as if set forth at length herein.

131.   The statements and promises made to Plaintiff that her relationship with her child would not be terminated were false, and known by A.M. and B.M. to be false when they made them.

132.   A.M. and B.M. made those false statements to Plaintiff with the intention of inducing Plaintiff to rely upon them.

133.   Plaintiff did rely upon the false statements of A.M. and B.M., not knowing them to be false and it was reasonable for her to place such reliance upon the statements under the circumstances then and there existing.

134.   The conduct of the Defendants, A.M. and B.M., constituted deceit, misrepresentation and fraud, constituting intentional tortious acts.

135.   As a direct and proximate cause of Defendants A.M. and B.M.'s tortious acts, the Plaintiff's life-long relationship with her child, E.F-P., has been terminated and the Plaintiff has lost the benefits of that relationship and has lost the life-long companionship with her child.

136.   As a direct and proximate cause of Defendants A.M. and B.M.'s tortious acts, the Plaintiff has been caused to suffer severe emotional distress, depression, mental harm and suffering and loss of enjoyment of life, all of which has been experienced by the Plaintiff since her loss of her relationship with her child and which will continue into the future.

137.   Because of Defendants A.M. and B.M.'s tortious acts complained of herein were with wanton and willful disregard for Plaintiff's rights and interests, or with reckless disregard therefrom, punitive damages are appropriate.

138.   Plaintiff's damages far exceed the minimum statutory requirement for Iowa District Court Jurisdiction.

WHEREFORE the Plaintiff, Abigail Fredericksen, prays for judgment against the Defendants, A.M. and B.M., jointly and severally, for deceit, misrepresentations and fraud for:

    a.    Compensatory money damages for the loss of the companionship with her child;

    b.    Compensatory money damages for past emotional distress and mental injury;

    c.    Compensatory money damages for future emotional distress and mental injury;

    d.    Compensatory money damages for impairment of her pursuit of her normal activities;

    e.    Compensatory money damages for impairment of her earning capacity;

    f.    Punitive damages;

g.   Interest and costs of suit; and

h.   An Order declaring that the termination of Plaintiff's constitutionally protected relationship with her child violated Plaintiff's rights guaranteed by the Fourteenth Amendment of the U.S. Constitution;

i.   An Order declaring the Iowa Adoption Law, I.C.A.: T.XV Subt. 1 ch 600 *et seq.*, is unconstitutional as it was applied to the termination of Plaintiff's constitutionally protected interest in her relationship with her child;

j.   An Order declaring that the Order terminating Plaintiff's parental rights and her relationship with her child be vacated;

k.   An Order directing that a hearing be scheduled to determine what visitation should be awarded to Plaintiff with her daughter E.F-P., consistent with the child's best interests; and

l.   All other relief deemed just and equitable.

## COUNT V

### Jennifer Olsen, in her Individual Capacity and in her Capacity as Guardian and Custodian of Plaintiff's Daughter E.F-P., Acting Under the Color of State Law for Tortious Interference with the Constitutionally Protected Parental Rights

139.   The allegations of Paragraphs 1 through 122 are incorporated by reference as if set forth a length herein.

140.   The acts of Defendant Olsen, both in her individual capacity and in her capacity as guardian and custodian of Plaintiff's child, constituted actionable tortious interference with the constitutionally protected parental rights of Plaintiff.

141.   As a direct and proximate cause of the numerous breaches of duties of the Defendant, Jennifer Olsen, and her tortious conduct in her capacity as guardian and custodian of E.F-P, the Plaintiff's life-long relationship with her child, E.F-P.,has been terminated and the Plaintiff has lost the benefits of that relationship and has lost the life-long companionship with her child.

142.    As a direct and proximate cause of Defendant Olsen's breach of duties and professional negligence, and tortious conduct in her capacity as guardian and custodian of E.F-P, the Plaintiff has been caused to suffer severe emotional distress, depression, mental harm and suffering and loss of enjoyment of life, all of which has been experienced by the Plaintiff since her loss of her relationship with her child and which will continue into the future.

143.    Because Jennifer Olsen's actions complained of herein were with wanton and willful disregard for Plaintiff's rights and interests, or with reckless disregard therefrom, punitive damages are appropriate.

144.    Plaintiff's damages far exceed the minimum statutory requirement for Iowa District Court Jurisdiction.

WHEREFORE the Plaintiff, Abigail Fredericksen, prays for judgment against the Defendant, Jennifer Olsen, in her individual capacity and in her capacity as Guardian and Custodian of Plaintiff's Daughter E.F-P., acting under the color of state law, for tortious interference with Plaintiff's constitutionally protected rights for:

a.    Compensatory money damages for the loss of the companionship with her child;

b.    Compensatory money damages for past emotional distress and mental injury;

c.    Compensatory money damages for future emotional distress and mental injury;

d.    Compensatory money damages for impairment of her pursuit of her normal activities;

e.    Compensatory money damages for impairment of her earning capacity;

f.    Punitive damages;

g.    Interest and costs of suit;

h.   An Order declaring that the termination of Plaintiff's constitutionally protected relationship with her child violated Plaintiff's rights guaranteed by the Fourteenth Amendment of the U.S. Constitution;

i.   An Order declaring the Iowa Adoption Law, I.C.A.: T.XV Subt. 1 ch 600 *et seq.*, is unconstitutional as it was applied to the termination of Plaintiff's constitutionally protected interest in her relationship with her child;

j.   An Order declaring that the Order terminating Plaintiff's parental rights and her relationship with her child be vacated;

k.   An Order directing that a hearing be scheduled to determine what visitation should be awarded to Plaintiff with her daughter E.F-P., consistent with the child's best interests; and

l.   All other relief deemed just and equitable.

## COUNT VI

### Jennifer Olsen, in both of her capacities and against A.M. and B.M., both individually and severally, in Civil Conspiracy

145.   The allegations of Paragraphs 1 through 124 are incorporated by reference as if set forth a length herein.

146.   The acts of all Defendants in all of their capacities, constituted a concerted effort and conspiracy, by and between and among the Defendants, to terminate the protected relationship of Plaintiff with her child for the purpose of placing legal custody of the child with A.M. and B.M., and to confer legal standing as parents of the Plaintiff's daughter in Defendants A.M. and B.M.

147.   The acts of the Defendants constituted a civil conspiracy to terminate the constitutional rights of the Plaintiff.

148.   As a direct and proximate cause of the numerous breaches of duties and tortious conduct of the Defendant, Jennifer Olsen, and the actions of A.M. and B.M. to advance their conspiracy, the

Plaintiff's life-long relationship with her child, E.F-P.,has been terminated and the Plaintiff has lost

the benefits of that relationship and has lost the life-long companionship with her child.

149.    As a direct and proximate cause of Defendant Olsen's breach of duties and professional

negligence, and tortious conduct and the tortious conduct of A.M. and B.M. to advance their civil

conspiracy,  the Plaintiff has been caused to suffer severe emotional distress, depression, mental

harm and suffering and loss of enjoyment of life, all of which has been experienced by the Plaintiff

since her loss of her relationship with her child and which will continue into the future.

150.    Because of Jennifer Olsen and A.M. and B.M.'s actions complained of herein were with

wanton and willful disregard for Plaintiff's rights and interests, or with reckless disregard therefrom,

punitive damages are appropriate.

151.    Plaintiff's damages far exceed the minimum statutory requirement for Iowa District Court

Jurisdiction.

WHEREFORE the Plaintiff, Abigail Fredericksen, prays for judgment against the

Defendants, Jennifer Olsen, in her both her capacities and A.M. and B.M., jointly and severally, for:

a.    Compensatory money damages for the loss of the companionship with her child;

b.    Compensatory money damages for past emotional distress and mental injury;

c.    Compensatory money damages for future emotional distress and mental injury;

d.    Compensatory money damages for impairment of her pursuit of her normal activities;

e.    Compensatory money damages for impairment of her earning capacity;

f.    Punitive damages;

g.    Interest and costs of suit;

38

h. An Order declaring that the termination of Plaintiff's constitutionally protected relationship with her child violated Plaintiff's rights guaranteed by the Fourteenth Amendment of the U.S. Constitution;

i. An Order declaring the Iowa Adoption Law, I.C.A.: T.XV Subt. 1 ch 600 *et seq.*, is unconstitutional as it was applied to the termination of Plaintiff's constitutionally protected interest in her relationship with her child;

j. An Order declaring that the Order terminating Plaintiff's parental rights and her relationship with her child be vacated;

k. An Order directing that a hearing be scheduled to determine what visitation should be awarded to Plaintiff with her daughter E.F-P., consistent with the child's best interests; and

l. All other relief deemed just and equitable.

Abigail Fredericksen,
Plaintiff

By: _____
M. Leanne Tyler
Tyler & Associates, P.C.
4431 East 56th Street
Davenport, IA 52807
(563) 355-4040 Telephone

Harold J. Cassidy
The Cassidy Law Firm
750 Broad Street, Suite 3
Shrewsbury, NJ 07702
(732) 747-3999
Applying for admission *Pro Hac Vice*

## REQUEST FOR TRIAL BY JURY

Plaintiff Abigail Fredericksen hereby requests a trial by jury on all issues.

                                   Abigail Fredericksen,
                                   Plaintiff,

By: _____
                                   M. Leanne Tyler
                                   Tyler & Associates, P.C.
                                   4431 East 56th Street
                                   Davenport, IA 52807
                                   (563) 355-4040 Telephone

                                   Harold J. Cassidy
                                   The Cassidy Law Firm
                                   750 Broad Street, Suite 3
                                   Shrewsbury, NJ 07702
                                   (732) 747-3999
                                   Applying for admission *Pro Hac Vice*